**INTERNATIONAL PAPER COMPANY,**
**Plaintiff,**

v.

**FIBREBOARD CORPORATION,**
**Defendant.**

**Civ. A. No. 4617.**

United States District Court,
D. Delaware.

April 30, 1974.

Andrew G. T. Moore, II of Killoran & Van Brunt, Wilmington, Del., and Charles B. Smith, William J. Gilbreth and Alfred L. Michaelsen of Fish & Neave, New York City, of counsel, for plaintiff.

David F. Anderson of Potter, Anderson & Corroon, Wilmington, Del., and Paul S. Lempio and Joseph L. Strabala of Phillips, Moore, Weissenberger, Lempio & Strabala, San Francisco, Cal., of counsel, for defendant.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

The three matters presently before the Court are: (1) the motion of the defendant Fibreboard Corporation ("Fibreboard") to enjoin the plaintiff International Paper Company ("International") from further participation in the Patent Office's consideration of Fibreboard's reissue patent application no. 404,385 filed on October 9, 1973, (2) International's motion to compel answers to Interrogatories 21 to 26 propounded to Fibreboard and to produce accompanying document requests, and (3) Fibreboard's motion for a protective order preventing further discovery by International regarding United States Patent No. 3,332,207 (the "Midnight patent"). The Court will treat each motion *seriatim.*

1. *Motion To Enjoin.*

International instituted the present suit on March 27, 1973, seeking a declaratory judgment that Fibreboard's United States Patent No. 3,482,372 (the

"Hottendorf patent") on a "Method And Apparatus For Packaging Containers" was invalid and not infringed by International. On April 30, Fibreboard answered the complaint and asserted a counterclaim for infringement of the Hottendorf patent by International. On May 21, International served and filed its reply to the counterclaim, denying infringement and averring the invalidity of the Hottendorf patent. Thereafter on August 24, International, acting upon information obtained through discovery, moved for leave to file an amended reply to Fibreboard's counterclaim to add the defense that the Hottendorf patent is invalid and unenforceable because of "patent misuse". The basis asserted for this charge was that Fibreboard had failed to discharge its uncompromising duty in the prosecution of the Hottendorf application to make a full disclosure to the Patent Office of material prior art known to it, in particular United States Patent No. 2,953,879 (the "Murray patent"), United States Patent No. 2,096,278 (the "Huebsch patent") and the Midnight patent. Since Fibreboard opposed the motion, the Court set the matter down for a hearing on January 11, 1974. On that day for the first time, counsel for Fibreboard revealed to the Court and to International that on October 9, 1973 he had filed in the Patent Office an application on Fibreboard's behalf to reissue the Hottendorf patent which included a citation of the Murray and Huebsch patents as possible prior art. Fibreboard stated that it filed the reissue application under the authority of Brenner v. State of Israel, 130 U.S.App.D.C 318, 400 F.2d 789 (1968) in order to obtain a Patent Office determination that the Murray and Huebsch patents were not material prior art references.[1] In addition, Fibreboard

submitted its counsel's affidavit in this suit at the January 11, 1974 hearing which averred that the Patent Examiner, who had previously examined the Hottendorf application, at an interview with Fibreboard's counsel on January 10, had expressed the opinion that the Murray and Huebsch patents were not pertinent prior art. Fibreboard relied upon that affidavit and the expressed opinion of the Examiner to oppose International's motion to amend its reply to the counterclaim.

Immediately thereafter on January 15, International, citing the above facts, petitioned the Patent Office for access to Fibreboard's reissue application. The petition was granted the same day, over Fibreboard's oral objection, by an Assistant Solicitor of the Patent Office upon a finding of "special circumstances" under 35 U.S.C. § 122 and authority of Ex parte Moore, 1927 C.D. 87.

One week later, on January 22, International filed with the Commissioner of Patents a formal protest to Fibreboard's reissue application and petitioned the Commissioner to exercise his supervisory authority to direct the Examiner (a) to reject the reissue application as a matter of law on the ground it did not satisfy the requirements of 35 U.S.C. § 251 and Rule 175 of the Patent Office Rules of Practice,[2] (b) after rejection to stay all further proceedings on the reissue application pending the outcome of this litigation as to the validity and enforceability of the Hottendorf patent, and (c) to declare that Fibreboard's January 10 interview with the Examiner was improper and that all actions there taken are *ultra vires*. Fibreboard on January 30, 1974, filed an opposition to International's protest and petition on the ground that International's protest was unauthorized and on January 31

1. The reissue application apparently made no other changes in the claims, specifications or drawings of the Hottendorf patent.

2. International contended that Fibreboard failed to file an oath or declaration showing

the reasons it believed the Hottendorf patent was inoperative or invalid or what specifications, drawings or claims were defective.

filed a petition with the Commissioner to reconsider and revoke the Assistant Solicitor's decision granting International's counsel access to the reissue application.

After considering these documents on February 4, 1974, Acting Assistant Commissioner for Patents William Feldman (1) denied Fibreboard's request that International's protest and petition be returned as unauthorized, (2) denied "without consideration of the merits" International's petition that the reissue application be rejected as a matter of law, (3) denied International's petition for a stay "without prejudice to being reconsidered," (4) declined to decide "at the present time" whether or not Fibreboard's interview of the Examiner was improper, (5) invited International to submit prior art to the Examiner, (6) directed the Examiner to consider the prior art submitted, and (7) ordered the Examiner to forward the reissue application to the Acting Assistant Commissioner's office after considering the application on the merits—without considering or commenting on any issues relating to possible fraud on the Patent Office.

On February 13, 1974 International's counsel served a petition for reconsideration and clarification of the February 4 decision, again urging the Commissioner of Patents to reject the reissue application as a matter of law. Alternatively, International informed the Commissioner it would submit prior art to the primary examiner of the reissue application and requested the February 4 decision be clarified to show International's right (1) to attend and participate in any interviews with the Examiner that Fibreboard's counsel might arrange, (2) to file rebuttal papers in response to any papers filed by Fibreboard concerning the reissue application, (3) to file a brief before the Board of Appeals in the event Fibreboard appeals any final rejection of the reissue application or

any claims thereof, and (4) to appear and be heard in any argument before the Board of Appeals on any such appeal of the reissue application.

This petition was denied by the Acting Assistant Commissioner in all respects and International's right to participate in the prosecution of the reissue application was limited to the submission of prior art as originally granted by the Acting Assistant Commissioner's February 4 decision.

Fibreboard now seeks to have this Court enjoin International from participating in the Patent Office reissue proceedings in the limited manner authorized by the Patent Office, arguing that reissue proceedings by statute are *ex parte* in nature and that International's intervention has disrupted and will continue to disrupt and delay issue of the reissue application.

The Court declines to interfere with the procedure adopted by the Patent Office. The Patent Office by its decisions of January 15 and February 4 concluded that since the validity and enforceability of the Hottendorf patent has been put in question by this litigation, the reissue application, filed by Fibreboard on the same patent, was such "special circumstances" under 35 U.S.C. § 122 as to relax the confidentiality normally surrounding reissue proceedings and to permit International access and a limited opportunity to cite pertinent prior art. This Court is unable to say that access by and the limited participation granted to International is improper in the light of the statute and Rules of Practice of the Patent Office. Moreover, the matter involved in the instant litigation is the Hottendorf patent, not the reissue application, so that the ongoing proceedings instituted by Fibreboard in the Patent Office are only of secondary interest to this Court. While the ultimate disposition of the reissue application may have some bearing on

the instant litigation, the connection at this time is not so direct as to justify this Court's interference in the Patent Office reissue proceedings. See United States v. Marifarms, Inc., 345 F.Supp. 858, 862–863 (D.Del.1972). Consequently, the Court declines to enjoin International's limited participation in the reissue proceedings authorized by the Patent Office.

### 2. *Motion To Compel Discovery.*

In addition to seeking access from the Patent Office, as to papers filed by Fibreboard in connection with its reissue application, International also on the same date served upon Fibreboard in this action its second set of interrogatories (Nos. 21–26) and document requests. The interrogatories requested information relating to Fibreboard's reissue application, particularly its interview of Examiner Abrams, and asked that Fibreboard identify various documents relating to its reissue application. The requests for documents asked that Fibreboard produce the documents so identified and provide plaintiff with a written list of any such documents withheld as privileged or otherwise immune from production.[3] Fibreboard has refused the discovery on grounds of irrelevancy and attorney-client privilege.

■ First with respect to the claim of irrelevancy, the Court finds that the information requested by the interrogatories and production is relevant. As previously mentioned, at the January 11 hearing, Fibreboard's counsel submitted the affidavit of Paul Lempio ("Lempio"), his co-counsel. This affidavit indicated that Lempio had interviewed Neil Abrams ("Abrams"), the Patent Examiner who had allowed the Hottendorf patent to issue. In the affidavit Lempio further avers that Abrams told

him that he had examined the Murray and Huebsch patents and had concluded that the claims of the Hottendorf patent were patentable over them. Also submitted to the Court was an agreement to the same effect signed by Abrams and Lempio.

By way of the Lempio affidavit, Fibreboard has put in issue in this litigation the factual assertions made by the Patent Examiner which may have some bearing, though not necessarily controlling, on the outcome of this case. The information now sought to be discoverable by International is the factual details surrounding the interview and the Patent Examiner's remarks. These are clearly relevant. Fibreboard, having put Abrams' opinion in issue to accomplish its ends, cannot now dismiss as irrelevant International's effort to uncover the full story surrounding the interview.

■ In the same vein, any attorney-client privilege that might have covered the particular matters sought has been waived. It would be manifestly unfair to allow Fibreboard to make factual assertions and then deny International an opportunity to uncover the foundation for those assertions in order to contradict them. Once Fibreboard disclosed certain of the factual details of Lempio's meeting with Abrams, it could not preclude International from discovering other relevant factual details leading up to and involving that meeting that were not mentioned in the affidavit. See 8 Wigmore, Evidence § 2327 (McNaughton Rev.1961); Lee National Corp. v. Deramus, 313 F.Supp. 224, 227 (D.Del.1970); American Optical Corp. v. Medtronic, Inc., 56 F.R.D. 426, 431 (D. Mass.1972); Gorzegno v. Maguire, 180 USPQ 23 (S.D.N.Y.1973). Therefore, Fibreboard will be ordered to answer In-

---

3. Since International has obtained a copy of all papers filed to date in the Patent Office and will be served in the future with all such papers by order of the Patent Office, International now excludes from the present motion the requests for such documents.

ternational's second set of interrogatories (Nos. 21–36) and produce the accompanying documents requested.

### 3. Motion For Protective Order.

We turn now to Fibreboard's motion for a protective order preventing further discovery regarding the Midnight patent. Involved are International's Interrogatories 3(j–r), 13, 16 and 19. Previously, Fibreboard had argued that the information sought by these interrogatories was not relevant to any issues involved in this lawsuit. On January 22, 1974 this Court rejected that argument and ordered Fibreboard to answer the interrogatories. Now Fibreboard is seeking a protective order on the ground that the matters inquired into cannot conceivably have any relevance to the instant litigation. In effect then, Fibreboard is rearguing its earlier position already rejected by the Court. The Court declines to do so.

■ There is also some suggestion in Fibreboard's moving papers that it is asserting attorney-client privilege as to the matters inquired into.[4] However, a bare allegation that information and documents are protected from discovery by the attorney-client privilege is insufficient without making more information available.

■■ To be sure it is well settled that where legal advice of any kind is sought from a professional legal advisor in his capacity as such, a *communication* relating to that purpose, made in confidence by the client, is at his instance permanently protected from disclosure by himself or by his legal advisor, unless the protection be waived. A corporation is entitled to the attorney-client privilege the same as any other client. Lee National Corp v. Deramus, 313 F.Supp.

224, 226 (D.Del.1970). More particularly, as Judge Wyzanski stated in United States v. United Shoe Machinery Corp., 89 F.Supp. 357, 358–359 (D. Mass.1950):

"The privilege applies only if (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a *fact* of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an *opinion* on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for purposes of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client."

■ Of course, attorney-client privilege extends only to communications between the attorney and client and not to correspondence with other parties in the possession of the attorney nor does the privilege apply to an attorney who is acting as a business agent of a party. 4 J. Moore, Fed.Practice, p. 26–235.

■ It is incumbent on one asserting the privilege to make a proper showing that each of the criteria set forth in the *United Shoe* case existed. Honeywell, Inc. v. Piper Aircraft Corp., 50 F.R.D. 117, 120 (M.D.Pa.1970). Such a showing is usually by affidavit in which the documents are adequately listed and described showing (a) the identity and corporate position of the person or persons interviewed or supplying the information, (b) the place, approximate date, and manner of recording or otherwise

---

4. Although Fibreboard's main brief appeared to raise attorney-client privilege, the Court is unsure that this was intended because in Fibreboard's reply brief, it was stated that "Defendant need not address itself to the is-sue of privilege, since it becomes moot when it is recognized as a matter of law information concerning the Midnight patent is not relevant."

preparing the instrument, (c) the names of the person or persons (other than stenographical or clerical assistants) participating in the interview and preparation of the document, and (d) the name and corporate position, if any, of each person to whom the contents of the document have heretofore been communicated by copy, exhibition, reading or substantial summarization. Manual For Complex Litigation, pp. 192–193.

A proper claim of privilege requires a specific designation and description of the documents within its scope as well as precise and certain reasons for preserving their confidentiality. Unless the affidavit is precise to bring the document within the rule, the Court has no basis on which to weigh the applicability of the claim of privilege. An improperly asserted claim of privilege is no claim of privilege at all. See Black v. Sheraton, 371 F.Supp. 97 (D.D.C. 1974); U. S. Philips Corp. v. United States, 177 USPQ 12, 13 (Ct.Cl.1972).

In short, a party resisting discovery on the ground of the attorney-client privilege must by affidavit show sufficient *facts* as to bring the identified and described document within the narrow confines of the privilege. Nor will submitting a batch of documents to the Court *in camera* provide an adequate or suitable substitute because the Court is often without information of what the document concerns or how it came into being or other relevant information which would enable it to determine whether the documents are privileged. Thus, if defendant wishes to claim an attorney-client privilege as to the documents relating to the Midnight patent, it should be done in accordance with the above guidelines. Accordingly, Fibreboard's motion for a protective order based on "attorney-client" privilege will be denied at this time.

An order will be entered in accordance with this opinion.